UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LORENZO ANTHONY,

        Plaintiff,                              Hon. Richard Alan Enslen

v.                                             Case No. 4:03 CV 129

TROY HUIZING, et al.,

        Defendants.

_____/

## REPORT AND RECOMMENDATION

        This matter is before the Court on <u>Defendant Richard Johnson's Motion and Brief to Adopt and Incorporate by Reference the Dismissal/Summary Judgment Motion and Supporting Brief Filed by his Co-Defendants</u>, (dkt. #108), <u>Plaintiff's Motion to Adopt and Incorporate by Reference Plaintiff's Affidavit in Opposition, Brief in Support, [and] Chart of Asserted Claims to Defendant Johnson's Response to Plaintiff's Complaint</u>, (dkt. #112), and <u>Plaintiff's Motion for Court's Assistance in Locating/Serving Unserved Defendant Larry Jackson</u>, (dkt. #110). Pursuant to 28 U.S.C. § 636(b)(1)(B), the Court recommends that the parties' respective motions to adopt and incorporate be **granted and Plaintiff's action dismissed**. The Court further recommends that Plaintiff's motion for assistance in effecting service be **denied as moot**.

## BACKGROUND

        The allegations in Plaintiff's complaint arise out of his claims that Defendant Huizing and other Michigan Department of Corrections (MDOC) officials forced him to participate in anal and

oral sex upon threats to his own life and to his family. The following allegations are contained in Plaintiff's complaint.

Plaintiff alleges that in September or October 2000, Defendant Huizing came to his cell with a napkin containing the address of Plaintiff's family, together with several pictures of Plaintiff's mother and sister. Huizing allegedly told Plaintiff that if he did not do as Huizing asked, Huizing would give the address to all of the inmates with whom Plaintiff had problems. Huizing also threatened to kill Plaintiff and to personally kill Plaintiff's family. Huizing demanded that Plaintiff have sex with him. Huizing allegedly repeated his threats each time he came to Plaintiff's cell. Sometime thereafter, Huizing came to Plaintiff's door with a security cart draped with a blanket. Huizing opened Plaintiff's window and asked if Plaintiff had made up his mind. Out of fear, Plaintiff agreed to comply if Huizing promised not to hurt either Plaintiff or his family. Huizing allegedly placed the security cart to block the view of Plaintiff's food tray slot, and unzipped his pants to expose his penis. He then placed his right leg hamstring on Plaintiff's slot and told Plaintiff to turn around and bend over. Plaintiff did as directed and Defendant Huizing allegedly penetrated his anus with his penis and performed anal sex. After several minutes, Huizing withdrew and threatened Plaintiff that if he reported the incident, his family would be killed. Plaintiff alleges that he suffered rectal bleeding, pain and soreness, as well as mental anguish. Plaintiff did not report the incident out of fear.

On March 4, 2002, Huizing approached Plaintiff and told him, "I want my dick sucked after chow so don't go to sleep." Plaintiff told Huizing to go away and that he would not do it again. Huizing again threatened Plaintiff's family and told Plaintiff that it would be the last time. Huizing came to Plaintiff's cell, again with the security cart to block the view of his activity. Huizing opened the food slot and pulled out his penis, ordering Plaintiff to perform oral sex. Plaintiff complied. After

Huizing ejaculated in Plaintiff's mouth, Huizing allegedly ordered him to turn around and back up to the door because he wanted to "finger fuck" him. Plaintiff rolled his mattress up, placed it by the door, stood on it, and bent over at the slot. Huizing penetrated Plaintiff's rectum with his finger. Plaintiff alleges that he again experienced pain, soreness, humiliation and mental anguish. After a short time, Huizing again threatened Plaintiff and told him not to dare to refuse him next time or Huizing would "kick his ass." After Huizing left, Plaintiff collected Huizing's semen on a piece of bed sheet and in a piece of plastic as evidence for the authorities. Plaintiff then wrote a kite to Defendant Inspector Macauley and RUM Ivy Rairigh, explaining the abuse and advising that he had secured a semen sample.

On March 28, 2002, Huizing came to Plaintiff's cell door and told him that the kites would never be believed and reminded Plaintiff that he had told him that if he reported the conduct, Huizing would kill his mother. Plaintiff pleaded with Huizing not to kill his mother. Huizing threatened to chain Plaintiff to the bed and beat him. Plaintiff apologized for complaining and told Huizing he would not complain again. Huizing allegedly told Plaintiff that he would have to "take care" of certain friends of Huizing's as punishment. Later, Huizing came to Plaintiff's cell with a security cart, pulled out his penis, and told Plaintiff to "jack him off quickly." Plaintiff complied and Huizing ejaculated on Plaintiff's face and hand. After zipping his pants, Huizing gave Plaintiff three candy bars and said, "Just to show you I'm not mad. But you'll have to take care of a friend of mines [sic]. You'll know who he is when he comes to you." When Huizing left, Plaintiff wiped the semen onto a piece of toilet paper to save for evidence.

On April 12, 2002, Plaintiff sent a letter to Defendant Feahr, post commander at the Ionia post of the Michigan State Police (MSP). In his letter, Plaintiff stated that he wanted to press charges against Huizing on the basis of the sexual assault. Plaintiff informed Feahr that he had a semen sample,

and he asked that a DNA test be conducted. Plaintiff asked the state police to undertake the investigation themselves because he feared having the complaint turned over to the MDOC Internal Affairs department.

Between April 13, 2002, and April 17, 2002, Plaintiff submitted several health care requests to Defendants Jones, Grider, and Sicklar requesting that he be tested for AIDS because he had been sexually assaulted by Huizing and exposed to semen. Defendants repeatedly informed Plaintiff that he would have to wait until the end of July, when his regular biannual AIDS testing was scheduled.

On April 20, 2002, Defendant Larry Jackson allegedly made a sexual comment to Plaintiff, telling him he was coming over to his cell that night for oral sex. When Plaintiff told him to leave him alone, Jackson told Plaintiff that Huizing sent him and reminded Plaintiff that Huizing had told him that Jackson was coming. Plaintiff alleges that Jackson has a history of sexually assaulting inmates and that Defendants Curtis, Macauley and Smith knew or should have known of that history but failed to take action.

On April 22, 2002, Huizing was delivering Plaintiff's mail, which included a letter from the MSP, a letter from Plaintiff's sister, and a copy of Plaintiff's grievance against health care, in which he complained about the denials of his requests to be tested for AIDS. Displaying the grievance, Huizing told Plaintiff, "You just fucked up." Plaintiff advised Huizing that he had already informed the state police of his actions. Huizing told Plaintiff that he had read the letter from the MSP, which advised that they were turning the complaint over to MDOC Internal Affairs, Huizing's "buddies" in Lansing. Huizing told Plaintiff, "Your mother is a dead bitch." Huizing then gave Plaintiff the grievance. In the letter from the MSP, Plaintiff was informed by Defendant Halliday that his complaint had been forwarded to the MDOC Department of Internal Affairs, in accordance with policy. Halliday enclosed

a copy of the letter forwarding the complaint to Defendant Hall of the MDOC Department of Internal Affairs. On that same date, Plaintiff gave inmate Fred Reeves, Plaintiff's legal assistant by prisoner agreement, a copy of the letter from Halliday to Hall and the bed-sheet semen sample, asking him to mail it to the MSP for DNA testing in relation to Plaintiff's complaint.[1] Reeves was asked to send a copy of the complaint to the United States Department of Justice.

On May 1, 2002, Defendant Roach of the MSP was at ICF on an unrelated matter. Defendant Macauley allegedly took it upon himself to inform Roach of Plaintiff's complaint to the state police and to suggest that Plaintiff's allegations were physically impossible and his story had repeatedly changed. Plaintiff alleges that he had never spoken with Macauley about the assaults.

On May 3, 2002, Plaintiff was taken to the dayroom for an interview with Defendant Sibert, an MDOC Internal Affairs Investigator. Sibert was investigating Plaintiff's complaint of sexual assault, which had been sent to the MSP and referred to MDOC Internal Affairs. While Plaintiff waited in the dayroom, Defendants Larry Jackson, Macauley and Sibert searched Plaintiff's cell. Sibert then came to the dayroom. Plaintiff told Sibert about the sexual abuse. He also told Sibert that he had a semen sample so the MSP could do a DNA test. Sibert told Plaintiff that staff had thrown away some of Plaintiff's property and asked if he thought he still had the evidence. Plaintiff told him it was hidden. Plaintiff was escorted to his cell by Defendants Sibert, Larry Jackson and Jensen. During the transfer, he saw his property, including legal documents, in a trash bag by the steps. Sibert followed Plaintiff's directions and found an envelope hidden behind the desk containing the toilet paper with semen. Sibert placed it in a plastic bag and left. Plaintiff was placed back in his cell and discovered that all his

---

[1] Plaintiff alleges that he had to ask Reeves to mail the letter and sample because Plaintiff did not have any money for postage.

paperwork and legal documents were missing. Plaintiff asked Larry Jackson why his documents had been thrown away. He was told that Defendant Macauley had ordered it. When Plaintiff demanded his property back, Larry Jackson told him to "stop ratting on staff and you wouldn't have no problems."

On May 6, 2002, Sibert contacted Roach and asked Roach to do a DNA test on the toilet-paper semen sample. He made arrangements to meet Sibert at 3:00 p.m. to accept the sample. However, at 12:55 p.m., Roach left a telephone message with Sibert stating that the MSP would not accept the evidence or perform a DNA test. Roach sent an e-mail to Defendant Schram to advise him that he did not intend to perform the DNA test because of Plaintiff's lack of credibility. Roach told Schram to advise him if he wanted anything else done.

Plaintiff subsequently wrote to Defendants Deputy MSP Director Bertee and Director Madden on May 22, 2002, and July 15, 2002, respectively. He renewed his complaint and objected to the manner it had been handled by the MSP. Neither Bertee nor Madden responded to Plaintiff's letters.

On May 13, 2002, Defendants Jensen and Barber escorted Plaintiff to the shower. During the transfer, Jensen deliberately lifted the handcuffs behind Plaintiff's back. Jensen then slammed Plaintiff's face and body into the wall. Defendant Barber allegedly began hitting Plaintiff in the ribs. Jensen told Plaintiff, "Now listen good, you're going to keep your fucking mouth shut and not mention or file anything else on my buddy Huizing. Tell everyone you lied, understand." When Plaintiff did not answer, Jensen again slammed Plaintiff's face into the wall until Plaintiff agreed.

Plaintiff alleges that on May 21, 2002, Defendants Jensen and Larry Jackson, as well as non-defendant Sergeant Van Amburg, removed him from his cell, led him to the dayroom and placed him in the dayroom cage. Then Defendants Jensen, Barber and Jackson went into the cage and assaulted Plaintiff, hitting and kicking him and slamming his head into the floor. Jackson told Plaintiff, "I was

going to fucking leave you alone last time, but you fucked up by writing that grievance, I don't give a fuck about this job, you're going to shut your mouth, I don't want to hear anything else about no grievances, that investigation is going nowhere. You shut your mouth and everything will go smoovely [sic] for you here." Jensen then hit Plaintiff in the stomach and stated, "Now do we have an understanding, good. Do as I say and you'll have no more problems, you'll get your food trays and everything. Now I'm going to give you a few minutes to calm down. When I get off you, don't do a thing. I'll kick you so hard in the balls you'll go unconscious understand."

Plaintiff alleges that between May 3, 2002, and June 2, 2002, he wrote three kites to Defendant Wayne, alleging that his property had been destroyed and seeking copies of his previously filed grievances so that he could file appeals. Plaintiff also alleged that staff members were throwing away his grievances. On June 11, 2002, Defendant Wayne responded that if Plaintiff needed documents, he should submit a F.O.I.A. (Freedom of Information Act) request. Plaintiff also alleges that he corresponded with Defendant Overton several times between June 10, 2002, and July 28, 2002 about a grievance filed against Defendant Sibert, to which Overton had failed to make a Step III response. Plaintiff alleges that Overton failed to respond.

Plaintiff also alleges that on June 10, 2002, he gave Defendant Owen mail addressed to the Michigan Attorney General regarding his sexual assault complaint about Defendant Huizing. Plaintiff complains that while he received a disbursement notice for the mailing charge, that notice improperly reflected mail sent by another prisoner, James Tyson. Plaintiff alleges his mail, therefore, was not properly mailed and that the disbursement was designed to mislead him. Plaintiff filed a grievance about the incident. Owen came to his cell on June 18, 2002, to investigate. Plaintiff alleges that Owen improperly investigated a grievance filed against him. He further alleges that Owen

"snatched" the notice from him and returned it the next day corrected to show that his letter had been mailed on June 11, 2002. Plaintiff alleges that the disbursement form was falsified. The grievance response indicated that a mistake had been made in referencing the proper letter on Plaintiff's disbursement form, but that investigation revealed the letter had been properly mailed.

On June 20, 2002, Plaintiff received a memorandum from Defendant Wayne, the grievance coordinator, asking Defendant Curtis to approve Plaintiff's placement on modified access[2] from June 20, 2002, through September 19, 2002, which Curtis approved. Plaintiff alleges that his grievance restriction was extended an additional 30 days on July 31, 2002, after he appealed his grievance against Owen. Plaintiff alleges that Defendants Wayne and Curtis conspired with Defendant Owen to retaliate against him for filing the grievance against Owen.

Plaintiff alleges that on June 4, 2002, he was moved from housing unit two to housing unit one due to his allegations against Defendants Huizing, Jackson, Barber and Jensen. On October 17, 2002, Plaintiff was transferred back to unit two. Plaintiff alleges that Defendant Olson, who was responsible for the transfer back to unit two, knew or should have known that in transferring Plaintiff, he was placing Plaintiff in danger of retaliation and assault. On October 17, 2002, Plaintiff wrote a letter to Defendants Smith, Huss, Goodson, Olson and Macauley, expressing his fear of coming out of his cell in unit two, and stating that he would not come out for showers unless a supervising officer was present. He alleges that these Defendants failed to take any action to assure his security, resulting in Plaintiff being unnecessarily deprived of his yard privileges and showers.

---

[2]Under MDOC policy, a prisoner is placed on modified access for filing "an excessive number of grievances which are frivolous, vague, duplicative, non-meritorious, raise non-grievable issues, or contain prohibited language. . .or [are] unfounded." MICH. DEP'T OF CORR., Policy Directive 03.02.130, ¶ II. The modified access period is ninety days and may be extended an additional thirty days for each time the prisoner continues to file a prohibited type of grievance. *Id.* While on modified access, the prisoner only can obtain grievance forms through the Step I coordinator, who determines whether the issue is grievable and otherwise meets the criteria under the grievance policy. *Id.*, ¶ LL.

On August 16, 2002, Defendant Overton authorized closure of Plaintiff's sexual assault complaint as unfounded. On August 26, 2002, Defendant Johnson sent a memorandum to Defendant Curtis reporting the investigation's conclusion and directing Curtis to issue a major misconduct charge against Plaintiff for interference with the administration of rules, on the basis that Plaintiff had filed a false complaint against Huizing. Defendant Groves, administrative assistant to Curtis, subsequently issued a misconduct report. Plaintiff was found guilty of this charge following a hearing.[3] Plaintiff later wrote Defendant Johnson, asking to have the sexual misconduct complaint reopened on the grounds of newly discovered evidence demonstrating a conspiracy between Defendants Macauley and Sibert. No action was taken.

Plaintiff asserts numerous claims for relief. He asserts that Huizing's sexual misconduct violated his rights under the Eighth Amendment and Due Process Clause of the Fourteenth Amendment and constituted the state tort intentional infliction of emotional distress. He also alleges that Huizing's threats to kill Plaintiff's mother because Plaintiff reported the sexual assault constitutes illegal retaliation in violation of the First Amendment and a violation of due process.

Plaintiff alleges that Defendants Jones, Sicklar and Lyons violated the Eighth Amendment when they denied him immediate AIDS testing based on his allegations. Plaintiff claims Defendant Larry Jackson sexually harassed him in violation of the Due Process Clause. He also alleges that Defendant Larry Jackson violated his right to due process by throwing away his legal materials, and that Jackson's conduct was motivated by an unconstitutional desire to retaliate against Plaintiff for the

---

[3] The hearing officer concluded that Plaintiff's allegations were not only incredible, but "near physically impossible due to the size of the foot slot door where prisoner alleged that the officer put his penis through his open food slot and into prisoner's rectum." (Dkt. #53, Exhibit 2). This conclusion is consistent with the results of the internal affairs investigation which concluded that Plaintiff's allegations "borders on being a biological impossibility." (Dkt. #1, Exhibit 8).

exercise of his First Amendment right to file a complaint against Huizing. Further, Plaintiff alleges that Defendant Larry Jackson's threats to physically assault Plaintiff violated the Eighth Amendment.

Plaintiff next alleges that Defendant Halliday violated the Eighth Amendment and the Equal Protection Clause of the Fourteenth Amendment by forwarding his sexual assault complaint from the MSP to the MDOC, notwithstanding Plaintiff's allegations of the significant risks caused by such a transfer. He alleges that Defendant Feahr violated due process by failing to respond to Plaintiff's complaint. Plaintiff further alleges that Defendant Bertee violated the Eighth Amendment and various state tort laws by refusing to conduct a DNA analysis of the semen sample.

Additionally, Plaintiff alleges that Defendants Macauley, Roach and Sibert conspired to deny him equal protection under the Fourteenth Amendment by interfering with the investigation of his sexual assault complaint and the conducting of DNA analysis. He alleges that Sibert misled Roach about the contents of Plaintiff's complaint, thereby violating his right to equal protection. Plaintiff also alleges that Defendant Sibert violated the Eighth Amendment by contacting Defendant Roach about possible DNA testing, rather than contacting Defendant Halliday, who had more complete information about the incident and who stated in her forwarding letter that she should be directly contacted by the MDOC if MSP involvement was warranted. He further alleges that Defendants Hall and Schram were negligent under Michigan law in failing to adequately supervise Defendant Roach. Moreover, Plaintiff alleges that Defendants Bertee and Madden were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment and were negligent under Michigan law in failing to respond to Plaintiff's letters of May 22, 2002, and July 15, 2002.

Plaintiff further alleges that Defendants Jensen, Barber and Jackson violated the Eighth Amendment by beating him and that Defendant Pettit violated the Eighth Amendment when he failed

to intervene in the beating. He also alleges that the beating was committed in retaliation for the filing of complaints, in violation of the First Amendment. In addition, Plaintiff alleges that the beating supports state-law claims of assault and battery and intentional infliction of emotional distress.

Plaintiff next alleges that Defendant Wayne's failure to provide him with copies of his previous grievances violated the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment. He alleges that Defendant Overton's failure to respond to his grievance was negligent.

Plaintiff alleges that Defendant Owen's switching Plaintiff's mail with that of another prisoner denied Plaintiff his First Amendment right to seek redress of his grievances. He alleges Defendant Wayne violated the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment by assigning Defendant Owen to investigate a complaint made against Owen. He alleges that Defendants Owen and Wayne conspired to cover-up Owen's violation of Plaintiff's First Amendment rights. In addition, he alleges that the actions of Wayne, Owen and Curtis in placing him on modified grievance access were taken in retaliation for his filing and appealing his grievance against Owen, in violation of the First Amendment.

Further, Plaintiff alleges that Defendant Olson violated his Eighth Amendment rights when he transferred Plaintiff back to housing unit two. He further alleges that Defendants Huss, Macauley, Goodson, Smith and Olson violated the Eighth Amendment and were negligent when they failed to respond to Plaintiff's kites complaining about his fear of staff in unit two.

Plaintiff alleges that Defendants Johnson, Curtis and Groves violated his First Amendment rights when they issued him a major misconduct in retaliation for filing a complaint of sexual assault against Huizing. Plaintiff also alleges that Defendant Fritt Jackson violated the Eighth Amendment, as well as state law, by failing to redact his social security number and date of birth from

certain records provided to another inmate. Finally, Plaintiff alleges that Defendant Johnson violated the Eighth Amendment and was negligent when he failed to reopen the complaint of sexual assault or investigate the alleged conspiracy of MDOC staff.

On October 22, 2003, the Court entered an Opinion and Order dismissing the vast majority of Plaintiff's claims. (Dkt. #7-8). Specifically, the Court dismissed all but the following claims: (1) Defendant Huizing sexually assaulted Plaintiff in violation of state law, as well as the Eighth and Fourteenth Amendments, (2) Defendant Huizing threatened to kill Plaintiff's mother in violation of the First and Fourteenth Amendment, (3) Defendants Jensen and Barber beat Plaintiff in violation of state law, as well as the First and Eighth Amendments, (4) Defendant Pettit failed to prevent Plaintiff's beating in violation of the Eighth Amendment, (5) Defendants Curtis and Groves charged Plaintiff with a major misconduct in violation of the First Amendment. Plaintiff's claims against Defendants Richard Johnson and Larry Jackson were also permitted to go forward.

On August 16, 2004, Defendants Barber, Curtis, Groves, Jensen, Pettit, and Huizing now moved for summary judgment. (Dkt. #52). On February 9, 2005, the undersigned issued a Report and Recommendation that Defendants' motion be granted. (Dkt. #103). On March 21, 2005, the Honorable Richard Alan Enslen adopted the Report and Recommendation and entered partial judgment in favor of Defendants Barber, Curtis, Groves, Jensen, Pettit, and Huizing. (Dkt. #114).

Defendant Richard Johnson now moves for dismissal and/or summary judgment. (Dkt. #108). In support of his motion, Defendant Johnson has submitted a short brief, but additionally requests that the Court incorporate by reference the pleadings previously filed by Defendants Barber, Curtis, Groves, Jensen, Pettit, and Huizing in support of their motion for summary judgment. The Court recommends that this request be granted. Accordingly, in analyzing this matter, the Court has considered

the previous pleadings submitted by Defendants Barber, Curtis, Groves, Jensen, Pettit, and Huizing, (dkt. #52-53), as well as the brief submitted by Defendant Johnson, (dkt. #108).

In response to Defendant Johnson's motion for dismissal and/or summary judgment, Plaintiff requests that the Court consider the pleadings he previously submitted in opposition to the motion for dismissal and/or summary judgment filed by Defendants Barber, Curtis, Groves, Jensen, Pettit, and Huizing. (Dkt. #82-84). The Court recommends that this request be granted. Accordingly, in evaluating Defendant Johnson's motion, the Court has considered Plaintiff's previously filed pleadings in opposition. (Dkt. #82-84).

**STANDARD**

When considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept as true all Plaintiff's allegations and construe the complaint liberally in Plaintiff's favor. *See Herron v. Harrison*, 203 F.3d 410, 414 (6th Cir. 2000). To survive a motion to dismiss, Plaintiff's complaint must allege facts, which if proved, would entitle him to relief. *See Helfrich v. PNC Bank*, 267 F.3d 477, 480-81 (6th Cir. 2001) (citations omitted).

In reviewing a motion for summary judgment, the Court must confine itself to the narrow questions of whether there exist "no genuine issue[s] as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). On a Rule 56 motion, the Court cannot try issues of fact, but is empowered to determine only whether there exist issues in dispute to be decided in a trial on the merits. *See Perez v. Aetna Insurance Co.*, 96 F.3d 813, 819 (6th Cir. 1996); *Aiken v. The City of Memphis*, 37 F.3d 1155, 1161 (6th Cir. 1994). The crux of the motion is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-

sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *see also*, *Terry Barr Sales Agency v. All-Lock Co. Inc.*, 96 F.3d 174, 178 (6th Cir. 1996).

A motion for summary judgment requires the Court to view "inferences to be drawn from the underlying facts...in the light most favorable to the party opposing the motion." *Matsushita Electric Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also*, *Terry Barr Sales Agency*, 96 F.3d at 178; *Schaffer v. A.O. Smith Harvestore Products, Inc.*, 74 F.3d 722, 727 (6th Cir. 1996). The opponent, however, has the burden to show that a "rational trier of fact [could] find for the non-moving party [or] that there is a 'genuine issue for trial.'" *Historic Preservation Guild of Bay View v. Burnley*, 896 F.2d 985, 993 (6th Cir. 1989); *see also*, *Schaffer*, 74 F.3d at 727.

As the Sixth Circuit has recognized, recent Supreme Court decisions have encouraged the granting of summary judgments, as such may be "an appropriate avenue for the 'just, speedy and inexpensive determination' of a matter." *Kutrom v. City of Center Line*, 979 F.2d 1171, 1173 (6th Cir. 1992). Consistent with this concern for judicial economy, "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient." *Anderson*, 477 U.S. at 252; *see also Bailey v. Floyd Board of Education*, 106 F.3d 135, 140 (6th Cir. 1997). Furthermore, mere allegations do not suffice. *See Cloverdale Equip. Co. v. Simon Aerials, Inc.*, 869 F.2d 934, 937 (6th Cir. 1989) ("the party with the burden of proof at trial is obligated to provide concrete evidence supporting its claims and establishing the existence of a genuine issue of fact").

## ANALYSIS

Pursuant to 42 U.S.C. § 1997e(a), a prisoner asserting an action with respect to prison conditions under 42 U.S.C. § 1983 must first exhaust all available administrative remedies. *See Porter*

*v. Nussle*, 534 U.S. 516, 524 (2002). The exhaustion requirement is mandatory and applies to all actions "brought with respect to prison conditions," regardless of the wrong alleged or the type of relief sought. *Id.* The district court is obligated to sua sponte enforce the exhaustion requirement. *See Brown v. Toombs*, 139 F.3d 1102, 1104 (6th Cir. 1998).

To satisfy the exhaustion requirement, the prisoner must allege and demonstrate that he has exhausted all available administrative remedies. Accordingly, the prisoner should attach to his § 1983 complaint the administrative decision resolving his complaint, if such decision is available. *Id.* In the absence of written documentation, the prisoner must describe with specificity the administrative proceeding and its outcome so that the Court may determine what claims, if any, have been properly exhausted. *See Knuckles-El v. Toombs*, 215 F.3d 640, 642 (6th Cir. 2000).

The prisoner must also specifically identify in his grievance the particular defendant(s) against whom his action is asserted, thus enabling the prison system to address the matter in the first instance. *See Curry v. Scott*, 249 F.3d 493, 505 (6th Cir. 2001); *VanDiver v. Martin*, 2002 WL 31166925 at *2 (6th Cir., Sep. 27, 2002) ("the issues [plaintiff] may raise, and the defendants he may name, in his lawsuit are limited to the specific individuals mentioned in his grievance"). The Sixth Circuit later clarified this concept, holding that "for a court to find that a prisoner has administratively exhausted a claim against a particular defendant, a prisoner must have alleged mistreatment or misconduct on the part of the defendant at Step I of the grievance process." *Burton v. Jones*, 321 F.3d 569, 575 (6th Cir. 2003).

Furthermore, the Sixth Circuit recently held that the Prison Litigation Reform Act mandates "total exhaustion." *Jones-Bey v. Johnson*, 407 F.3d 801, 806 (6th Cir. 2005). Thus, when a prisoner files a "mixed" complaint, alleging both exhausted and unexhausted claims, the entire action

must be dismissed if the prisoner has failed to exhaust all available administrative remedies as to *any* of the claims in the complaint. *Id.* at 805-09.

While Plaintiff has submitted evidence that he properly exhausted many of the claims in his complaint, he has failed to establish that he exhausted his administrative remedies as to his claims against Defendant Richard Johnson. The Court recommends, therefore, that Plaintiff's claims against Defendant Johnson be dismissed. In light of the total exhaustion rule, the Court also recommends that Plaintiff's claims against Defendant Larry Jackson, the only remaining Defendant in this matter, also be dismissed. Accordingly, the Court further recommends that Plaintiff's motion for assistance in serving Defendant Jackson be denied as moot.

## CONCLUSION

For the reasons articulated herein, the Court recommends that <u>Defendant Richard Johnson's Motion and Brief to Adopt and Incorporate by Reference the Dismissal/Summary Judgment Motion and Supporting Brief Filed by his Co-Defendants</u>, (dkt. #108), be **granted**; <u>Plaintiff's Motion to Adopt and Incorporate by Reference Plaintiff's Affidavit in Opposition, Brief in Support, [and] Chart of Asserted Claims to Defendant Johnson's Response to Plaintiff's Complaint</u>, (dkt. #112), be **granted**; <u>Plaintiff's Motion for Court's Assistance in Locating/Serving Unserved Defendant Larry Jackson</u>, (dkt. #110), be **denied**; and Plaintiff's action **dismissed**.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file

objections within the specified time waives the right to appeal the District Court's order.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

                  Respectfully submitted,

Date:  July 25, 2005              /s/ Ellen S. Carmody
                  ELLEN S. CARMODY
                  United States Magistrate Judge